**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| IN RE:<br><br>**Western Concrete Pumping, Inc.,**<br>EIN XX-XXX6060<br>6275 W. Plano Pkwy., Ste. 500<br>Plano TX 75093<br><br>**Debtor.** | **Case No.:**  **24-40234-BTR**<br><br>**Chapter:**  **11; Subchapter V** |

**PLAN OF REORGANIZATION**
**OF WESTERN CONCRETE PUMPING, INC.**

The Debtor proposes this Plan for the resolution of the outstanding claims against and interests in the Debtor pursuant to Chapter 11, Subchapter V, of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THE PLAN AND THE EXHIBITS TO THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION**
**OF TIME, AND GOVERNING LAW**

*A. Defined Terms.*

As used in this Plan and unless defined elsewhere in the Plan, capitalized terms have the meanings set forth below.

1. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estate under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estate and operating the businesses of the Debtor; (b) Allowed Professional Fee Claims in the Chapter 11 Case; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

2. "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date.

3. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not the Debtor, the term "Affiliate" shall apply to such Person as if the Person were the Debtor.

4.      "*Allowed*" means, with respect to any Claim, except as otherwise *provided* in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed by any party in interest within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt: (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

5.      "*AFCO Secured Claim*" means the Secured Claim of AFCO Acceptance Corp. d/b/a AFCO Insurance Premium Finance.

6.      "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid and recover a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

7.      "*Bankruptcy Case*" means the Debtor's bankruptcy case pending in the Bankruptcy Court.

8.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, in effect as of the Confirmation Date.

9.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.

10.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the general, local, and chambers rules of the Bankruptcy Court.

11.      "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered

an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

12.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

13.    "*California Lawsuit*" means, collectively, the several lawsuits pending as *Medina, et. al. v. Western Concrete Pumping, Inc., et al.*, Case No. CIVDS1803726 [Lead Case] against the Debtor, including:

*Michael Andrew Medina-Jimenez and Angel Medina v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS1803726-Lead - filed 2/20/2018);

*Miguel Julian Medina and Maria Lourdes Diaz Medina v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDSl 804593 - filed 2/23/2018);

*Brandon Crowell, Brian Crowell, Jasen Thomsen, and Jeremy Thomsen v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS 1819461 - filed 7 /27/2018);

*Gloria Lenard v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS 1830770 - filed 11/27/2018);

*Kerry Lynn Gomez and Colleen V Wallen v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS 1902459 - filed 1/24/2019);

*Scottsdale Insurance Company v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS 1920107 - filed 7 /11/2019);

*Joyce Sanders and Shyene Hamilton v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS2003138 - filed 1/31/2020);

*Heliodoro Garcia v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS2003663 - filed 2/3/2020); and

*Wawanesa General Insurance Company v. Western Concrete Pumping, Inc., et al.* (Case No.: CIVDS2023056 - 10/26/2020).

14.    "*CA Insurance Proceeds Pool*" means all proceeds of each of the Debtor's insurance policies that relate to the California Lawsuit, including but not limited to policies with American Guarantee and Liability Insurance Company ($11 million), Hartford Fire Insurance Company ($2 million), Hallmark Specialty Insurance Company ($2 million) and RSUI Indemnity Company ($1 million), which shall be paid to the Debtor for equitable distribution to holders of CA Plaintiff Claims under the Plan after a Final Order is entered finally determining and resolving all claims and issues among all parties in the CA Lawsuit.

15.    "*CA Plaintiff Claims*" means the Unsecured Claims of all plaintiffs arising from the California Lawsuit against the Debtor.

16. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

17. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

18. "*Chapter 11 Case*" means the above entitled and numbered case which was commenced by the Debtor's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

19. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtor.

20. "*Claims Register*" means the official register of Claims maintained by the Bankruptcy Court.

21. "*Class*" means a class of Claims or Interests as set forth in <u>Article III</u> hereof pursuant to section 1122(a) of the Bankruptcy Code.

22. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in <u>Article IX.A</u> of the Plan having been (a) satisfied or (b) waived pursuant to <u>Article IX.B</u> of the Plan.

23. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

24. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

25. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

26. "*Consummation*" means the occurrence of the Effective Date.

27. "*Cure Claim*" means a Claim based upon the Debtor's defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

28.　　"*Debtor*" means Western Concrete Pumping, Inc.

29.　　"*Disbursing Agent*" means the Reorganized Debtor, or the Entity or Entities selected by the Reorganized Debtor to make or facilitate distributions pursuant to the Plan to all other parties.

30.　　"*Disposable Income*" has the meaning ascribed to such term in section 1191(d) of the Bankruptcy Code.

31.　　"*Disputed Claim*" or "*Disputed Interest*" means any Claim or Interest that the Debtor or Reorganized Debtor believes is unliquidated, disputed, or contingent and which has not been Allowed by Final Order of a court of competent jurisdiction or by agreement with the Debtor or the Reorganized Debtor.

32.　　"*Distribution Record Date*" means the record date for purposes of making Plan Distributions on account of Allowed Claims, which date shall be the first day following the Bar Date.

33.　　"*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date set forth in <u>Article IX.A</u> of the Plan have been satisfied or waived in accordance with <u>Article IX.B</u> of the Plan, and (c) the Debtor declares the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

34.　　"*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

35.　　"*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in the Debtor.

36.　　"*Estate*" means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

37.　　"*Executory Contract*" means a contract to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

38.　　"*Exculpated Partie*s" means, collectively, and in each case, in its capacity as such: the Debtor and its current and former equity holders, officers, directors, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

39.　　"*Federal Judgment Rate*" means the federal post-judgment interest rate in effect as of the Petition Date.

40.　　"*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

41.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, re-argument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

42.     "*First United Bank Secured Claim*" means the Secured Claim of First United Bank and Trust Company.

43.     "*General Unsecured Claim*" means any Unsecured Claim that is not a CA Plaintiff Claim.

44.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

45.     "*GUC Recovery*" means the sum of (a) projected Disposable Income as of the Effective Date of the Plan and (b) Net Litigation Recoveries of the Debtor actually received within the five (5) years after Confirmation, payable *Pro Rata* and *pari passu* to Class 6A General Unsecured Claims, Class 6B CA Plaintiff Claims, and Class 6C Other Insurance Claims in quarterly installments in accordance with section III.B.6 of the Plan.  The estimated amount of projected Disposable Income and Net Litigation Recoveries as of the date of filing of the Plan is shown in the Debtor's Projections attached to the Plan as Exhibit A.

46.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

47.     "*Interest*" means any Equity Security in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor.

48.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

49.     "*Net Litigation Recoveries*" means the net amount of proceeds actually recovered in Cash by the Debtor after first accounting for all costs of collection including attorney fees and expenses, expert fees and expenses, and costs of court from the pursuit, prosecution, or settlement of any Avoidance Actions.

50.     "*Other Insurance Claims*" means any Unsecured Claim, other than a CA Plaintiff Claim, arising from a Claim or lawsuit against the Debtor that may be covered, in whole or in part, by insurance.

51.     "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

52.     "*Other Secured Claim*" means any Secured Claim, other than the First United Bank Secured Claim, the AFCO Secured Claim, or any Secured Tax Claim, including any Claim arising under, derived from, or based upon any letter of credit issued in favor of the Debtor, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

53.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

54.     "*Petition Date*" means February 1, 2024, the date on which the Debtor commenced the Chapter 11 Case.

55.     "*Plan*" means this *Plan of Reorganization of Western Concrete Pumping, Inc.* as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan.

56.     "*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under the Plan.

57.     "*Plan Settlement*" means the good faith compromise and settlement of all Claims, Interests, and controversies as described in Article IV.A of the Plan.

58.     "*Plan Supplement*" means, to the extent applicable and to the extent not previously disclosed in the Plan, any Schedule of Retained Causes of Action and any Schedule of Rejected Executory Contracts and Unexpired Leases, all of which shall be incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time, which shall be filed with the Court prior to the Confirmation Hearing.

59.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

60.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class. In the case of the Pro Rata distribution of the GUC Recovery to Classes 6A, 6B, and 6C, such calculation shall be made on the basis of the Allowed amounts of Claims in such Classes on a combined basis.

61.     "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, 1103, or 1183 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

62.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

63.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case by the applicable Bar Date.

64.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

65.     "*Released Parties*" means individually and collectively, and in each case, in its capacity as such:  the Debtor and its current and former equity holders, officers, directors, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

66.     "*Reorganized Debtor*" means the Debtor, or any successor thereto or assign thereof, by merger, consolidation, or otherwise, on and after the Effective Date.

67.     "*Retained Causes of Action*" means those Causes of Action of the Debtor and its Estate that are retained under the Plan, including those specifically identified in Article IV.M "Preservation of Causes of Action" and that are not released, waived, or transferred pursuant to the Plan.

68.     "*Restructuring Transactions*" shall have the meaning set forth in Article IV.B.

69.     "*Schedules*" means, collectively, the schedules of assets and liabilities, and statement of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

70.     "*Schedule of Retained Causes of Action*" means any supplemental schedule of Causes of Action of the Debtor and its Estate that may be filed prior to the Effective Date.

71.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means any supplemental schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtor pursuant to the Plan that may be filed prior to the Effective Date.

72.     "*Secured Claim*" means a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

73.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

74.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

75.     "*Subchapter V Trustee*" means the duly appointed sub-chapter V trustee in Debtor's Bankruptcy Case.

76.     "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

77.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

78.     "*Unsecured Claim*" means any Claim that is not an Administrative Claim, a Professional Fee Claim, a Secured Claim, a Priority Tax Claim, or an Other Priority Claim.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles, sections, and subsections of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action,

order, or approval of the Bankruptcy Court or any other Entity; and (14) the word "or" is not exclusive.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtor or the Reorganized Debtor, to the extent such Entity is not incorporated in Texas, shall be governed by the laws of the state of incorporation of the Debtor or the Reorganized Debtor.

E.     *Controlling Document.*

In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

F.     *Background.*

This section provides a brief overview and history of the Debtor's business operations and summarizes the events leading up to the filing of the Chapter 11 Case. Creditors and other parties may disagree with statements contained in this Background. The Background is for informational purposes only and shall not be deemed accurate or have preclusive effect in any future proceeding.

1.     <u>Overview and History of the Debtor.</u>

The Debtor, Western Concrete Pumping, Inc., was incorporated in 1986 and since such time has become one of the nation's largest concrete pumping companies servicing Texas, Southern California, Arizona, and Louisiana. The Debtor has approximately 250 employees utilizing a fleet of over 125 leased machines which range from the extremely versatile 20 meter, to the largest boom in North America, the mighty 70 meter. The Debtor also has access to small and midline trailer pumps, as well as a full array of high-rise pumps, and separate placing booms, and also offers other specialty equipment, including Mini-Placers, conveyor belts, and Somero line pulling products. Texas leads the Debtor with nearly half the revenue, employees and machines offered, followed by California, Arizona, and Louisiana.

2.      Events Leading to Bankruptcy.

*California Litigation.*   On February 16, 2018, Michael Coley was operating a concrete pumping truck westbound on Interstate 10 near the city of Rialto. According to Mr. Coley's testimony, he was driving in the number three lane when he heard what sounded like a tire blowout. He looked in the driver's side mirror but did not see anything, and by the time he looked again out the windshield, the truck had veered left and was about to go through the center divider. Mr. Coley attempted to steer to the right but was unable to and the vehicle travelled through the center divider guardrail and into eastbound traffic where it collided with five vehicles, including a motorcycle. The result was tragic; a fire started immediately, consumed at least three vehicles, and five lives were lost. Heliodoro Garcia was operating a stake bed truck and was allegedly injured in the accident. This accident led to various lawsuits filed against the Debtor, constituting the California Lawsuit.

*Mediation Efforts.*   To attempt to resolve the California Lawsuit, Debtor mediated with the CA Plaintiffs via counsel and a mediator of the CA Plaintiffs' choosing. Three days of mediation were held on October 19th and 24th 2023, and January 26, 2024. The Debtor offered the full amount of its insurance coverage ($16 million) and more, but the CA Plaintiffs did not accept the Debtor's offers. Having failed to come anywhere close in amount and reach a resolution, the Debtor was forced to seek bankruptcy protection.

*Restructuring Professionals.*   The Debtor retained Carrington, Coleman, Sloman & Blumenthal, L.L.P. as its restructuring counsel.  With the assistance of these professionals, the Debtor analyzed the strategic alternatives to maximize value for the benefit of all stakeholders.  As a result of these efforts, the Debtor formulated the terms of this Plan and commenced the Chapter 11 Case.

3.      Feasibility and Projected Disposable Income.   The feasibility of the Plan is demonstrated by the Debtor's Projections attached as Exhibit A.  Because of the nature of this low-margin construction service business and the Debtor's consistently high operational expenses and capital expenditures, the Debtor's projected Disposable Income is limited. Accordingly, to provide the Debtor's creditors with the best possible outcome in Plan payments, the Debtor has submitted the Plan to provide creditors with the Debtor's projected Disposable Income for the maximum 5-year period authorized by the Bankruptcy Code. The Debtor's estimated assets and liabilities are provided within the Debtor's Schedules (as of the Petition Date) and attached Projections and Liquidation Analysis (as of the anticipated Effective Date of the Plan). Further details explaining the Debtor's feasibility and projections are provided in the notes preceding Exhibit A.

4.      The Liquidation Analysis.   The Debtor's Liquidation Analysis, attached as Exhibit B, demonstrates that the Debtor's Plan of Reorganization provides a superior recovery to all claimants and stakeholders than would a chapter 7 liquidation. Further details explaining the detriment to creditors if the Plan is not confirmed and the Debtor is forced to liquidate in chapter 7 are provided in the notes preceding Exhibit B.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A.      Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtor or the Reorganized Debtor each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim becomes due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtor or the Reorganized Debtor, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except for Professional Fee Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtor no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Effective Date.  Objections to such requests must be Filed and served on the requesting party within thirty (30) days after the Filing of the applicable request for payment of the Administrative Claims, if applicable.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor, the Reorganized Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any notices, objection, or other action from the Reorganized Debtor or any action or approval by the Bankruptcy Court.

*B.*     *Professional Fee Claims.*

1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>.  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 30 days after the Effective Date.  Objections to Professional Fee Claims shall be due 21 days after the Filing of the same.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtor shall promptly pay all Allowed Professional Fee Claims in Cash in the Allowed amount of such Professional Fee Claim.

2.     <u>Post-Effective Date Fees and Expenses</u>.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtor.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Code.

*C.*     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.*     *Classification of Claims and Interests.*

Except for the Claims addressed in <u>Article II</u> of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The classification of Claims and Interests against the Debtor pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Deemed Accepting |
| 2 | First United Bank Secured Claim | Impaired | Entitled to Vote |
| 3 | AFCO Secured Claim | Unimpaired | Deemed Accepting |
| 4 | Other Secured Claims of: | Unimpaired | Deemed Accepting |
| 4A | Ally Financial | Unimpaired | Deemed Accepting |
| 4B | Leaf Capital Funding LLC | Unimpaired | Deemed Accepting |
| 4C | Pawnee Leasing Corp. | Unimpaired | Deemed Accepting |
| 4D | Stellantis Financial Services Inc. | Unimpaired | Deemed Accepting |
| 5 | Other Priority Claims | Unimpaired | Deemed Accepting |
| 6A | General Unsecured Claims | Impaired | Entitled to Vote |
| 6B | CA Plaintiff Claims | Impaired | Entitled to Vote |
| 6C | Other Insurance Claims | Impaired | Entitled to Vote |
| 7 | Interests in the Debtor | Impaired | Entitled to Vote |

B.    *Treatment of Claims and Interests.*

1.    <u>Class 1 – Secured Tax Claims</u>.

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims against the Debtor.

(b)    *Treatment*:

(i)    Each holder of an Allowed Class 1 Secured Tax Claim shall retain its full rights and Liens to the extent of its Allowed Class 1 Claim until its Allowed Class 1 Claim has been paid in full.

(ii)    <u>Liens and Interest</u>.  Any and all Liens (both those arising before and after the Petition Date) held by the holder of an Allowed Class 1 Claim shall be preserved in any transfer of assets under the Plan. Each holder of an Allowed Class 1 Claim shall be entitled to receive interest from the Petition Date to the Effective Date pursuant to section 506(b) of the Bankruptcy Code, as well as from the Effective Date until paid in full at a statutory rate of 1% per month as required by section 511 of the Bankruptcy Code.  If any post-petition *ad*

*valorem* taxes are not paid prior to the State law delinquency date, each holder of an Allowed Class 1 Claim shall be entitled to receive any penalties and interest that accrue under State law based on the nonpayment of such tax.

    (iii)   <u>No Modification</u>.  The Reorganized Debtor shall make all required payments due to the holder of an Allowed Class 1 Claim.  Neither the Plan nor the Confirmation Order shall modify the terms of the Debtor's obligations.

    (c)   *Voting*:  Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

2.    <u>Class 2 – First United Bank Secured Claim</u>.

    (a)   *Classification*:  Class 2 consists of the First United Bank Secured Claim.

    (b)   *Treatment*:

    (i)   <u>No Modification</u>.  The Reorganized Debtor shall make all required payments due to the holder of the Allowed Class 2 Claim in accordance with the Debtor-creditor prepetition agreements and the Court's Final Order Granting Debtor's Motion to Authorize Postpetition Debtor in Possession Financing, entered on March 5, 2024 at Dkt. 105 (the "***DIP Financing Order***").  Neither the Plan nor the Confirmation Order shall modify the terms of the Debtor's obligations under the DIP Financing Order, except that any postpetition attorney fees or expenses requested by First United Bank shall be paid by the Debtor pursuant to Article II of the Plan governing Administrative Claims.

    (ii)   <u>Liens and Interest</u>.  Any and all Liens (both those arising before and after the Petition Date) held by the holder of an Allowed Class 2 Claim shall be preserved in any transfer of assets under the Plan.  The holder of the Allowed Class 2 Claim shall be entitled to receive interest from the Petition Date to the Effective Date pursuant to section 506(b) of the Bankruptcy Code and the DIP Financing Order.

    (c)   *Voting*:  The Holder of the Class 2 Claim is impaired and entitled to vote on the Plan.

3.    <u>Class 3 – AFCO Secured Claim</u>.

    (a)   *Classification*:  Class 3 consists of the <u>AFCO</u> Secured Claim.

(b) *Treatment*:

    (i) <u>No Modification</u>. The Reorganized Debtor shall make all required payments due to the holder of the Allowed Class 3 Claim in accordance with the Debtor-creditor prepetition agreements and the Court's Order Granting Debtor's Motion to Authorize Payment of Prepetition Insurance Coverage, entered on February 9, 2024 at Dkt. 53 (the "***Insurance Order***"). Neither the Plan nor the Confirmation Order shall modify the terms of the Debtor's obligations under the Insurance Order.

    (ii) <u>Liens and Interest</u>. Any and all Liens (both those arising before and after the Petition Date) held by the holder of an Allowed Class 3 Claim shall be preserved in any transfer of assets under the Plan. The holder of the Allowed Class 3 Claim shall be entitled to receive interest from the Petition Date to the Effective Date pursuant to section 506(b) of the Bankruptcy Code and the Insurance Order.

(c) *Voting*: The Holder of the Class 3 Claim is conclusively presumed to have accepted the Plan and, accordingly, is not entitled to vote on the Plan.

4. <u>Class 4 – Other Secured Claims</u>.

(a) *Classification*: Class 4 consists of any Other Secured Claims against the Debtor, with each holder of an Other Secured Claim being classified in its own respective sub-Class within Class 4.

(b) *Treatment*:

    (i) On the Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each holder of an Allowed Class 4 Claim shall receive, at the option of the Debtor: (i) payment in full in Cash of its Allowed Class 4 Claim; (ii) the collateral securing its Allowed Class 4 Claim; (iii) Reinstatement of its Allowed Class 4 Claim; or (iv) such other treatment rendering its Allowed Class 4 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (ii) <u>Liens and Interest</u>. Any and all Liens (both those arising before and after the Petition Date) held by the holder of an Allowed Class 4 Claim shall be preserved in any transfer of assets under the Plan.

(c) *Voting*: Holders of Class 4 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

5.      <u>Class 5 – Other Priority Claims</u>.

(a)     *Classification*:  Class 5 consists of any Other Priority Claims against the Debtor.

(b)     *Treatment*:  On the Effective Date, except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Priority Claim, each holder of an Allowed Class 5 Claim shall receive Cash in an amount equal to such Allowed Class 5 Claim on the later of: (i) the Effective Date; or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 4 Claim.

(c)     *Voting*:  Holders of Class 5 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

6.      <u>Class 6A – General Unsecured Claims</u>.

(a)     *Classification:*  Class 6A consists of all General Unsecured Claims against the Debtor.

(b)     *Treatment:* In accordance with the Plan Settlement, and except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed Class 6A Claim shall receive its *Pro Rata* share of the GUC Recovery.  The GUC Recovery shall be distributed in quarterly installments, commencing on the third anniversary of the Effective Date, to holders of Allowed General Unsecured Claims.  The Debtor shall have the option, within its sole discretion, to make the GUC Recovery payments early without any penalty or further obligation for payments to this Class under the Plan.

(c)     *Voting:* Holders of Class 6A Claims are entitled to vote to accept or reject the Plan.

6B.     <u>Class 6B – CA Plaintiff Claims</u>.

(a)     *Classification:*  Class 6B consists of all Allowed CA Plaintiff Claims against the Debtor.

(b)     *Treatment:* In accordance with the Plan Settlement, and except to the extent that a holder of an Allowed CA Plaintiff Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed CA Plaintiff Claim, each holder of an Allowed Class 6B Claim shall receive its *Pro Rata* share of:

(i)       the CA Insurance Proceeds Pool to the extent such Claim is not paid in full by other insurance or a third party. The CA Insurance Proceeds Pool shall be distributed to Class 6C within thirty (30) days after all holders of such Claims have (x) had their Claims fully liquidated in a Final Order, (y) exhausted recoveries from all other third-party payors or sources outside the CA Insurance Proceeds Pool, and (z) had their Claims Allowed by the Bankruptcy Court and the CA Insurance Proceeds have been received by the Debtor for distribution under the Plan; and

(ii)      the GUC Recovery to the extent such Claim is not paid in full by insurance or a third party. The GUC Recovery shall be distributed in quarterly installments, commencing on the third anniversary of the Effective Date, to holders of Allowed CA Plaintiff Claims. The Debtor shall have the option, within its sole discretion, to make the GUC Recovery payments early without any penalty or further obligation for payments to this Class under the Plan.

(c)    *Voting:* Holders of Class 6B Claims are entitled to vote to accept or reject the Plan.

6C.    <u>Class 6C – Other Insurance Claims</u>.

(a)    *Classification:* Class 6C consists of all Allowed Other Insurance Claims against the Debtor.

(b)    *Treatment:* In accordance with the Plan Settlement, and except to the extent that a holder of an Allowed Other Insurance Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed CA Plaintiff Claim, each holder of an Allowed Class 6C Claim shall receive its *Pro Rata* share of the GUC Recovery to the extent such Claim is not paid in full by insurance or a third party. The GUC Recovery shall be distributed in quarterly installments, commencing on the third anniversary of the Effective Date to holders of Allowed Other Insurance Claims. The Debtor shall have the option, within its sole discretion, to make the GUC Recovery payments early without any penalty or further obligation for payments to this Class under the Plan.

(c)    *Voting:* Holders of Class 6C Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Interests in the Debtor</u>.

(a)    *Classification*: Class 7 consists of all of the Interests in the Debtor.

(b)    *Treatment*: On the Effective Date, all Class 7 Interests shall remain in place at their prepetition priority and status.

(c)   *Voting*:  Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *General Settlement of Claims and Interests.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan (collectively, the "***Plan Settlement***").  The Plan shall be deemed a motion to approve the Plan Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court the Plan Settlement is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate. All distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.   *Restructuring Transactions.*

On the Effective Date, the Debtor or the Reorganized Debtor shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the terms set forth in the Plan (collectively, the "***Restructuring Transactions***").  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.     *Reorganized Debtor.*

The Reorganized Debtor shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

D.     *Sources and Uses of Consideration for Plan Distributions.*

The Reorganized Debtor shall fund Plan Distributions with: (1) Cash on hand; (2) the receivables and proceeds of operations; and (3) proceeds of Debtor's insurance.

E.     *Corporate Existence.*

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtor shall continue to exist after the Effective Date as a corporate entity with all the powers of a corporation pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed.

F.     *Vesting of Assets in the Reorganized Debtor.*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in and of the Estate, all of the Debtor's and the Estate's Causes of Action, including all of the Retained Causes of Action of the Debtor and its Estate specifically enumerated in Article IV.M "Preservation of Causes of Action" or any Schedule of Retained Causes of Action, and any property acquired by the Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action, including the Retained Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.     *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims, including credit agreements, shall be cancelled and the obligations of the Debtor shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.  For the avoidance of doubt, the Equity Securities and Interests in the Debtor existing as of the Petition Date shall not be cancelled and shall be reinstated upon the Effective Date in the Reorganized Debtor in the same nature and same priority and extent as existing in the Debtor as of the Petition Date.

H.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions contained in the Plan; and (2) all other actions contemplated by the Plan. All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or the Reorganized Debtor, as applicable. On or (as applicable) prior to the Effective Date, the appropriate directors and officers of the Debtor or the Reorganized Debtor shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this <u>Article IV.H</u> shall be effective notwithstanding any requirements under non-bankruptcy law. The Plan requires no rate changes that are subject to regulatory approval per section 1129(a)(6), and the Debtor has no retiree benefits to be continued under the Plan per section 1129(a)(13).

I.      *Organizational Documents.*

All existing corporate and organization documents of the Debtor (the "***Governing Documents***") existing as of the Petition Date shall remain in full force and effect; *provided*, *that*, to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Debtor will amend its Governing Documents, if necessary, to prohibit the issuance of non-voting equity securities and to ensure an appropriate distribution of voting power among any remaining equity classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

After the Effective Date, the Reorganized Debtor may amend and restate its Governing Documents and other constituent documents, as permitted by the laws of the state of its incorporation.

J.      *Directors and Officers of the Reorganized Debtor.*

The management of the Reorganized Debtor, including the identity of all directors and officers, will remain unaltered upon Confirmation. The officer compensation shall remain the same as it was prior to Confirmation, being $350,000 for the CEO and $350,000 for the CFO. The management of the Reorganized Debtor shall consist of Charles D. Reed, Jr., as Director and Chief Executive Officer, and Brett A. Reid, as Director and Chief Financial Officer and Secretary.

K.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtor, and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan

in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Avoidance Actions and Causes of Action of the Debtor and its Estate, whether arising before or after the Petition Date, including all Causes of Action specifically enumerated in this Article IV.M or any Schedule of Retained Causes of Action, and the Reorganized Debtor's rights to commence, prosecute, or settle such Avoidance Actions and Causes of Action shall be preserved and retained notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u>.

The Reorganized Debtor reserves and shall retain all such Avoidance Actions and Causes of Action of the Debtor and its Estate notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor, except as otherwise expressly provided in the Plan, including <u>Article VIII</u> of the Plan.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Avoidance Actions and Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Without limitation, the Retained Causes of Action include all claims and assets listed in the Debtor's Schedules, including all accounts receivable in Part 3 (Dkt. 87, p. 4), and the loans

advanced to American Concrete Pumping LP and claims related to the Confidentiality Agreement disclosed against the plaintiffs in the California Lawsuit in Part 11 (Dkt. 87, p.9). For the following reasons, the Debtor does not believe these claims will produce net recoveries:

A) The Debtor has a note receivable of approximately $1 million due from a company in Georgia, American Concrete Pump Supply (ACPS), that provides specialty parts and supplies purchasing and procurement services, that required start-up capital, primarily for purchase order financing, totaling $1 million for the purchase of spare or high wear parts for concrete pumps that are sourced internationally from Turkey, India, and, in a few cases, China. The note is deemed to be uncollectible, and ACPS has considered discontinuing operations since it cannot support any further loan or investment.

The Debtor has attempted to collect on the note by requesting a financial and business review, which ACPS completed, and the Debtor also met with the minority owner of ACPS just this past January to potentially collect over time. The Debtor does not believe the ACPS has value after review of ACPS's financial statements, operations, and market potential considering the additional investment required. Also, ACPS is not mature enough as a company to be attractive to sell to a competitor; ACPS is just one person with contacts and leads in foreign markets who source gray-market parts for concrete pumps.

In conclusion, there is no inventory or other assets on the books of ACPS and the operation is only a brokerage service and does not turn a profit. Therefore, the $1 million investment via the ACPS Note Receivable was used for start-up expenses and has not proven to be a viable stand-alone company in the purchasing and procurement and parts sales business. The Debtor expects to write off the ACPS Note Receivable in its auditor financial review for 2023 year-end closing entries. The Debtor will likely charge off the debt as uncollectible in its financial statements and dissolve its interest in the company.

B) For purposes of mediation with the Plaintiffs in the California Lawsuit, the Debtor entered into a Confidentiality Agreement with each such Plaintiff before sharing proprietary and confidential information. The Confidentiality Agreement required each Plaintiff to destroy or return all such information at the end of the mediation. The mediation effort was conducted in October 2023 and January 2024. The Debtor's litigation counsel requested confirmation from Plaintiffs that the confidential information was destroyed; however, no Plaintiffs would respond that they complied with their obligations.

Accordingly, the Debtor has claims against each of the Plaintiffs for breach of the Confidentiality Agreement. If the Plaintiffs ever disseminate or provide Debtor's confirmation information to any third parties, the Debtor's business could be materially and negatively affected. Losing just a portion of the Debtor's business to a competitor due to information concerning the Debtor's financial information could amount to millions of dollars.

However, recently, one Plaintiff expert has belatedly indicated the confidential information has been destroyed or purged, and the Debtor will continue its request for confirmation that all Plaintiff recipients of Debtor's confidential information has complied with the Confidentiality Agreement.

For disclosure purposes only, the Debtor does not currently believe that it has viable and material (a) fraudulent transfer claims to pursue or (b) preference claims to pursue largely because any prepetition payments made to Debtor's vendors and lessors were made for reasonably equivalent in the ordinary course of business and/or are subject to additional defenses of subsequent or contemporaneous new value. *See also* "Equipment Leases" below. Further, the Debtor's vendors are critical to the Debtor's ongoing business and viability of the Plan and, therefore, in the Debtor's business judgment, more harm would come than good in pursuing these chapter 5 causes of action that have colorable defenses. Accordingly, the Debtor does not anticipate that there will be any Net Litigation Recoveries. Notwithstanding the foregoing, no Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Causes of Action against it as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue all available and viable Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

*N.*     *Equipment Leases.*

The Plaintiffs in the California Lawsuit have asked for information concerning the Debtor's leases, and this section provides additional information for their consideration. The Debtor is open to cost savings wherever they may be found but believes its leases of vehicles are at or below current market levels. The Debtor's business requires specific concrete pumping equipment which is operated and maintained by its trained and certified crew of laborers and management. As is customary in the concrete pumping industry (as well as other heavy equipment construction service companies), the Debtor leases the equipment from other companies. In some cases, these leasing companies are owned by shareholders or affiliated companies, as in the car rental industry. The Debtor leases from various companies, several of which are owned entirely or partially by one or the other of the shareholders of the Debtor in entities established for the specific purposes of purchasing, financing, and leasing the equipment to various concrete pumping companies, including the Debtor and other companies not affiliated with the shareholders. The equipment purchased from primarily two leading manufacturers and ranges in price from $0.4 million to $1.6 million per machine depending upon the make, model, and year for the large truck mounted equipment. Monthly rents for this type of equipment range from $1,000 to $22,700 from an older small machine to a large newer machine. There are about 123 machines of this type being leased to the Debtor for a monthly amount of about $1.1 million. In addition, there are other types of smaller or specialty equipment for other types of applications that cost below $400k and have monthly leases that range from $350 to $11,500 per month for 37 units for another $121,000 per month.

Each equipment leasing company purchases the machine and obtains financing from banks and other lending institutions who specialize in equipment financing. The rates of interest and terms vary depending upon the same variables and timing of purchase and also what the cost of funds is in the market and credit conditions of the company, as is customary in the industry. Each

lessor leases the equipment to various companies, including the Debtor, at a market rate or, in some cases, lower than the current market rate, for a fixed amount per month per machine for a term of 5 years with renewals. The lease rate established at inception of the lease is benchmarked against the underlying cost of the machine and its financing cost at that time. Machines are leased until the Debtor no longer requires it and chooses not to renew or ask for early termination at which point the leasing company will work with the Debtor to adjust to its demand, transfer, sell or trade off the machine for another. The Debtor also leases from other sources on short term bases from manufacturers and other pump companies nationally.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Except as otherwise provided herein, on the Effective Date, all Executory Contracts or Unexpired Leases not (i) previously assumed or rejected pursuant to an order of the Bankruptcy Court; (ii) contained in any Schedule of Rejected Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) subject to a motion to reject filed and pending as of the Effective Date; or (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, will be ***assumed*** in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

Notwithstanding the foregoing, any Executory Contracts or Unexpired Leases that are the subject of a pending, unresolved objection to any proposed cure amount or motion to reject, to assume, or to assume and assign as of the Effective Date, shall be rejected, assumed, or assumed and assigned in accordance with the provision of the Order(s) finally adjudicating such pending, unresolved objections or motions. Nothing herein shall prohibit the Debtor from amending or modifying any pending, unresolved motion to reject, assume, or assume and assign prior to the final adjudication of such motion (with leave of the Bankruptcy Court if such leave is otherwise required by applicable Rule).

**Debtor has proposed no cures or $0.00 cure amounts for all Executory Contracts and Unexpired Leases to be assumed under this Plan. All objections to Debtor's proposed cure amounts not made in writing and filed with the Bankruptcy Court prior to the Confirmation Hearing shall be deemed waived, released, or overruled as of the Effective Date.**

B.   *Pass-Through*

Except as otherwise provided in the Plan, any rights or arrangements necessary or useful to the operation of the Reorganized Debtor's business, but not otherwise addressed as a Claim or Interest or assumed under <u>Article V</u> of the Plan, including nonexclusive or exclusive patent, trademark, copyright, or other intellectual property licenses, and other contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Plan or Confirmation Order, be passed through the Chapter 11 Case for the benefit of the Reorganized Debtor, provided that, notwithstanding anything to the contrary herein, any Claim thereunder shall be treated in accordance with the distribution provisions of the Plan.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims.

D.      *Preexisting Obligations to the Debtor under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor or the Reorganized Debtor under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor contracting from counterparties to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtor.

F.      *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or the Reorganized Debtor shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

G.      *Nonoccurrence of Effective Date.*

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interests (as applicable) shall begin receiving payments toward the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

Except as otherwise provided herein, all Plan Distributions shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, if the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtor.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent. The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred on or After the Effective Date. Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and

expense reimbursement claims (including reasonable attorneys' fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    <u>Record Date for Distribution</u>.  On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    <u>Delivery of Distributions in General</u>.  Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtor; *provided further*, *however*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.

3.    <u>Minimum Distributions</u>.  No Cash payment of less than $50.00 shall be made to a holder of an Allowed Claim on account of such Allowed Claim.  In such case, the amount of such distribution shall be deferred to the next distribution date until such time as the payment amount either (a) exceeds $50.00 or (b) is the final payment due under the Plan.

4.    <u>Undeliverable Distributions and Unclaimed Property</u>.  If any distribution to any holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall attempt to determine the actual then-current address of such holder.  If the current address is identified, the Disbursing Agent shall make a second attempted distribution.  To the extent that any distribution is unclaimed as of the earlier of 3 months from the initial distribution attempt or 6 months after the Distribution Record Date, such distributions shall be deemed unclaimed property.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

E.    *Manner of Payment.*

1.    All distributions of Cash to the holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtor.

2.    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and

all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.     *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.     *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtor, and no holder of a prepetition Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

I.     *Setoffs and Recoupment.*

Except as expressly provided in this Plan, the Reorganized Debtor may, pursuant to applicable law, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that the Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount between the Reorganized Debtor and holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that the Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of Claims against, or Interests in, the Debtor be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtor or the Reorganized Debtor unless such holder actually has performed such recoupment in accordance with applicable law and provided notice thereof in writing to the Debtor in accordance with Plan Article XII.G on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

*J.*        *Claims Paid or Payable by Third Parties.*

1.        <u>Claims Paid by Third Parties</u>.  The Debtor or the Reorganized Debtor shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or the Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.        <u>Claims Payable by Third Parties</u>.  No Plan Distribution shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.        <u>Applicability of Insurance Policies</u>.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

4.        <u>Insurance Proceeds are Property of the Estate</u>.  In accord with Fifth Circuit authority in *In re OGA Charters, L.L.C.*, 901 F.3d 599 (5th Cir. 2018) and *Law Office of Rogelio Solis v. Curtis*, No. 23-40125, 2023 U.S. App. LEXIS 26621 (5th Cir. Oct. 6, 2023), all proceeds of each of the Debtor's insurance policies that relate to the California Lawsuit, including but not limited to policies with American Guarantee and Liability Insurance Company ($11 million), Hartford Fire Insurance Company ($2 million), Hallmark Specialty Insurance Company ($2 million) and RSUI Indemnity Company ($1 million), shall be paid to the Debtor after a Final Order is entered finally determining and resolving all claims and issues among all parties in the CA Lawsuit for equitable distribution to creditors under the Plan under the priorities set forth in the Bankruptcy Code.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims.*

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtor shall have the sole authority to:  (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Adjustment to Claims or Interests without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtor or the Reorganized Debtor or by a Final Order of the Bankruptcy Court for objecting to such Claims or extending any deadline for objecting to such Claims.

E.      *Disallowance of Claims or Interests.*

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as any objection to those Claims or Interests have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by the Entity have been turned over or paid to the Reorganized Debtor.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such**

**Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

F.     *Amendments to Claims or Interests.*

Except as provided herein, on or after the Bar Date, a Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and any such new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

G.     *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VII.D hereof, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

H.     *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Discharge of Claims.*

The Debtor shall receive a discharge of all debts, as set forth more fully below, arising before the Effective Date.  The timing of the discharge will depend on whether the Plan is confirmed as a consensual plan or a cramdown plan pursuant to Bankruptcy Code sections 1191(a) or (b), respectively.  *See* 11 U.S.C. § 1181(c).

1.     Consensual Plan - Discharge Under Bankruptcy Code section 1141(d).

IF THIS PLAN IS CONFIRMED PURSUANT TO BANKRUPTCY CODE SECTION 1191(A), THE DEBTOR SHALL RECEIVE A DISCHARGE PURSUANT TO BANKRUPTCY CODE SECTION 1141(D), AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF ALL CLAIMS, INTERESTS, AND CAUSES OF ACTION OF ANY KIND OR

NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTOR OR ANY OF ITS ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTOR PRIOR TO THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN BANKRUPTCY CODE SECTIONS 503, 502(G), 502(H), OR 502(I), IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO BANKRUPTCY CODE SECTION 501; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO BANKRUPTCY CODE SECTION 502; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN.  THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

      2.    <u>Non-Consensual – Discharge Under Section 1192</u>.

IF THIS PLAN IS CONFIRMED AS A CRAMDOWN PLAN PURSUANT TO BANKRUPTCY CODE SECTION 1191(B), THE DEBTOR SHALL RECEIVE A DISCHARGE AS SOON AS PRACTICABLE AFTER COMPLETION BY DEBTOR OF ALL PAYMENTS DUE UNDER THE PLAN. *SEE* 11 U.S.C. § 1192.  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, OF ALL CLAIMS, INTERESTS, AND CAUSES OF ACTION OF ANY KIND OR NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTOR OR ANY OF ITS ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTOR PRIOR TO THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND

SPECIFIED IN BANKRUPTCY CODE SECTIONS 503, 502(G), 502(H), OR 502(I), IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO BANKRUPTCY CODE SECTION 501; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO BANKRUPTCY CODE SECTION 502; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN.  THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE AND THE FINAL DISTRIBUTION DATE CONTEMPLATED UNDER THE PLAN.

**B.** *Release of Liens.*

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtor elects to reinstate in accordance with Article III.B hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**C.** *Releases by the Debtor.*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtor, the Reorganized Debtor, and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted or assertable on behalf of the Debtor, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case, the Plan, any Restructuring Transaction, the Plan Settlement, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the**

Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C by the Debtor, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtor and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to the Debtor or the Reorganized Debtor asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their respective property.

D.     *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Claim or Cause of Action related to any act, event, or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or prosecution of the Plan, the Plan Settlement, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution or retention of property under the Plan or any other related agreement, unless such Entity's action is determined in a Final Order to have constituted bad faith, actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice or opinions of counsel, certified public accountants, and other experts and professionals with respect to their duties and responsibilities pursuant to the Bankruptcy Code or Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.     *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from (a) taking any of the following actions against, as applicable, the Debtor and/or the Reorganized

**Debtor:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan; and (b) taking any actions of the kind described in clauses (1) through (5) above against, as applicable, the Exculpated Parties or Released Parties in connection with any act, event, or omission and Causes of Action from which the Exculpated Parties and Released Parties have been exculpated or released by or under this Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this <u>Article VIII.E</u> of the Plan.**

F.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor, or another Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

G.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

H.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.B</u> hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor, and shall;

(a)     authorize the Debtor to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;

(b)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)     authorize the Debtor, as applicable or necessary, to: (i) implement the Restructuring Transactions; and (ii) make all distributions and issuances as required under the Plan; and

(d)     authorize the implementation of the Plan in accordance with its terms.

2.      the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.      all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been reserved pending approval by the Bankruptcy Court; and

4.      the Debtor shall have implemented the Restructuring Transactions and all transactions contemplated herein, pursuant to documentation acceptable to the Debtor.

B.      *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this <u>Article IX</u> may be waived by the Debtor without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (1) constitute a waiver or release of any Claims by the Debtor, Claims, or Interests; (2) prejudice in any manner the rights of the Debtor, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any holders of Claims or Interests, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtor reserves the right to modify the Plan, whether such modification is material or immaterial.

B.      *Revocation or Withdrawal of Plan.*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtor amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 or 1191 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid;

13.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

15.     enter an order concluding or closing the Chapter 11 Case;

16.     adjudicate any and all disputes arising from or relating to Plan Distributions;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.*     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all counterparties to Executory Contracts and Unexpired Leases with the Debtor.

B.      *Additional Documents.*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or the Reorganized Debtor and all holders of Claims or Interests receiving Plan Distributions and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

F.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.      *Notices.*

All notices, requests, elections or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing provided such writing shall have been sent by first-class, registered or certified mail, postage prepaid, return receipt requested.  Any notices required to be delivered to the Debtor and/or the Reorganized Debtor shall be addressed as follows:

**To Debtor and/or Reorganized Debtor:**

Charles Reed
6275 W. Plano Parkway, Suite 500
Plano, TX  75093

**With copies to:**

Mark A. Castillo
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main Street, Suite 5500
Dallas, TX  75202
Email: markcastillo@ccsb.com

-and-

Guillermo Marrero
International Practice Group
1350 Columbia Street, Suite 500
San Diego, CA  92101
Email: gmarrero@ipglaw.com

H.     *Exhibits.*

All exhibits and documents included herein are a part of the Plan as if set forth in full in the Plan.

I.     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtor's consent; and (3) nonseverable and mutually dependent.

J.     *Closing of Chapter 11 Case.*

All fees remaining due under 28 U.S.C. § 1930 shall be paid at Confirmation.  The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, File with

the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

K.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

L.      *Conflicts.*

Except as set forth in the Plan, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

Dated:  March 25, 2024                    Respectfully submitted by:

WESTERN CONCRETE PUMPING, INC.

By: _____
Name:  Charles D. Reed, Jr.
Title:   Chief Executive Officer

# EXHIBIT A

## Debtor's Projections

Exhibit A to the Plan shows the Company's five-year projection beginning May 1, 2024, and concluding April 30, 2029. The Company has entered a more mature state of low single digit growth after the ramp up of leased fleet assets and additional labor yielding a revenue increase 47% from 2020 to 2022, an opportunity created in the post pandemic pent-up demand being realized finally. Revenue in 2023 finished at 3% over 2022 and is projected to remain relatively flat to slightly up at 4.5% and 4.0% in 2025 and 2026, respectively, some of which will be pricing to inflation. To keep things in perspective, the business achieved revenue levels of $43 million and $42 million in year 2017 and 2018, respectively, and then $43 million in 2019 and $45 million in 2020. The step up in revenue is due to the pandemic pent-up demand being met by capital investment by the owners to grow in leased assets, employees, branch locations, and states where commercial and infrastructure work was awarded to them.

Although 2024 through 2026 is projected to grow due to favorable large contracts in backlog in the segments of Infrastructure, Warehouse, Manufacturing, and Residential (high rise only), the Company expects that total revenue growth to only rise to 2% in 2027 and thereafter, as these large projects complete and are not replaced. The Company is more concentrated in Commercial, Infrastructure and Institutional work than Residential, which only represents about 18% of total revenue, most of which is high rise versus single family homes. The company does not expect to pivot to the low cost, overcrowded competitive segment of single-family homes. The projected result includes an erosion of profitability due to the continued inflationary costs in labor, machines, services, insurance, and interest rates, along with other increased back-office costs of administrating the expanded size and complexity of the now larger company. In addition, the Debtor will not be able to invest in new capacity of machines and labor with the encumbrance of the required Plan payments nor be able to pivot to single family homes, which require a different mix of pump trucks and operators.

The Net Residual Income projected will require additional debt or capital injection by the owner shareholders to sustain it during the five-year plan period. For modeling purposes, the capital is classified as subordinated debt as a note payable to the shareholders that will accrue interest but not have any principal repayment until the completion of the Plan payments to the unsecured creditors. As seen in Exhibit A, the current shareholder note payable will increase from just under $2 million to just under $5 million by the end of 2025, a $3 million capital injection from the Shareholders to support the company during the restructuring period. This will enable the company to pay its creditors above what the Chapter 7 liquidation would provide over the 5-year period and on a net present value basis.

The Debtor remains committed to a favorable resolution to the creditors by maintaining its operation at the level required to reach these projected results and continue to share any information the creditors require to understand the business and financial realities, risks and opportunities in its reorganization caused by this unfortunate event in February 2018.

EXH. A

**EXHIBIT A**
**Debtor's Projections**

Western Concrete Pumping, Inc.
Disposable Income Projection
(in 000's)

| | | May-Dec 2024 | 2025 | 2026 | 2027 | 2028 | Jan-Apr 2029 | Five Yr. Total |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | $ | 48,904 | $ 74,268 | $ 77,239 | $ 78,784 | $ 80,359 | $ 25,564 | $ 385,118 |
| | % YoY Chg | 3.0% | 4.5% | 4.0% | 2.0% | 2.0% | 2.0% | |
| **Less: Expenses** | | | | | | | | |
| Cost of Sales-Direct Labor | | 14,182 | 21,538 | 22,399 | 22,847 | 23,304 | 7,414 | 111,684 |
| Cost of Sales-Fuel, Parts, Svc, Other | | 13,986 | 21,298 | 22,227 | 22,756 | 23,216 | 7,385 | 110,868 |
| Occupancy | | 1,184 | 1,812 | 1,848 | 1,885 | 1,922 | 654 | 9,304 |
| Equipment Lease Expense-LLC's | | 9,580 | 14,331 | 14,331 | 14,332 | 14,371 | 4,567 | 71,512 |
| Equipment Rental Expense-Other | | 488 | 747 | 762 | 777 | 792 | 291 | 3,856 |
| General & Administrative Expense | | 6,098 | 9,285 | 9,424 | 9,565 | 9,709 | 3,285 | 47,366 |
| Selling & Advertising | | 2,592 | 3,946 | 4,006 | 4,066 | 4,127 | 1,396 | 20,132 |
| Interest Expense - existing debt | | 195 | 293 | 278 | 229 | 137 | 15 | 1,146 |
| State Income Taxes | | 87 | 136 | 142 | 144 | 147 | 50 | 706 |
| Capital Expenditures for tools, misc pumping equipment | | 549 | 831 | 840 | 848 | 857 | 286 | 4,210 |
| Tax Distributions to Shareholders | | - | - | 100 | 120 | 150 | 60 | 430 |
| BKY Pmt - Ch.11 Sub.V Trustee | | 20 | - | - | - | - | - | 20 |
| BKY Pmt - BKY Legal Counsel | | 275 | - | - | - | - | - | 275 |
| BKY Pmt - Financial Advisors | | 215 | - | - | - | - | - | 215 |
| BKY Pmt - Class 1 Tax Secured Claims | | 3 | 4 | 4 | 4 | 4 | - | 20 |
| BKY Pmt - Class 2 First United Bank Secured Claim | | - | - | - | - | - | - | - |
| BKY Pmt - Class 3 AFCO Insurance Secured Claim | | - | - | - | - | - | - | - |
| BKY Pmt - Class 4A Ally Financial Secured Claim | | 138 | 158 | 87 | 5 | - | - | 388 |
| BKY Pmt - Class 4B LEAF Capital Funding LLCV Secured Claim | | 32 | 48 | 48 | 48 | 48 | 1 | 227 |
| BKY Pmt - Class 4C Pawnee Leasing Corp Secured Claim | | 5 | - | - | - | - | - | 5 |
| BKY Pmt - Class 4D Stellantis Financial Services Inc. Secured Claim | | 20 | 31 | 31 | 31 | 31 | 9 | 151 |
| **Projected Disposable Income from Operations** | $ | (745) | $ (189) | $ 713 | $ 1,127 | $ 1,545 | $ 153 | $ 2,604 |
| Add: Insurance Proceeds | | 16,000 | - | - | - | - | - | 16,000 |
| **Projected Disposable Income from Operations and Insurance** | $ | 15,255 | $ (189) | $ 713 | $ 1,127 | $ 1,545 | $ 153 | $ 18,604 |
| BKY Pmt - Class 5 Other Priority Claims | | - | - | - | - | - | - | - |
| BKY Pmt - Class 6A General Unsecured Claims | | - | - | - | (220) | (220) | (109) | (550) |
| BKY Pmt - Class 6B Tort Plaintiff Unsecured Claim | | (16,000) | - | - | (777) | (777) | (499) | (18,054) |
| BKY Pmt - Class 6C Other Insurance Claims | | - | - | - | - | - | - | - |
| BKY Pmt - Class 7 Interest in Debtors | | - | - | - | - | - | - | - |
| **Projected Residual Disposable Income, after payments** | $ | (745) | $ (189) | $ 713 | $ 130 | $ 547 | $ (456) | $ (0) |
| Line of Credit Advances/(Repayments) | | 750 | 200 | (700) | - | - | 200 | 450 |
| **Projected Net Remainder** | $ | 5 | $ 11 | $ 13 | $ 130 | $ 127 | $ (256) | $ 450 |
| **Cash on Hand Balance** | $ | 5 | $ 16 | $ 29 | $ 158 | $ 286 | $ 30 | |
| **Line of Credit Balance (max of $3 mil)** | $ | 2,050 | $ 2,250 | $ 1,550 | $ 1,550 | $ 1,550 | $ 1,750 | |

**EXHIBIT B**

**Liquidation Analysis**

The Debtor owns no real estate and leases most of its revenue producing and other support vehicles. Hence, the Debtor's assets mostly consist of insurance proceeds and accounts receivable. The Debtor's assets include very little cash, limited inventory of spare parts for its trucks and pumps that are not commercially sold and have minimal value to anyone other than the Debtor, and a few vehicles and equipment, most of which are subject to liens to Debtor's secured creditors due to the financing of those vehicles. Hence, most of the Debtor's Plan is funded by its insurance, receivables, and future operations.

The Debtor's proposed Chapter 11 Plan is better for the Debtor's creditors than a Chapter 7 Liquidation primarily due to the impairment in a Chapter 7 Liquidation of the Debtor's accounts receivable. The receivables represent a significant portion of the Company's assets and approximately 75% of the Debtor's total receivables are related to current and ongoing contracts. Hence, the estate would incur significant collection issues in a liquidation as well as damages for breach of contract from the Debtor's major customers.

The Chapter 7 Liquidation scenario is especially troublesome for the Company due to the nature of the commercial subcontract work that Debtor specializes in and that constitutes a significant portion of Debtor's revenue and backlog. Debtor's contracts for materials and services take many forms including master services agreements with individual work orders, individual project subcontracts, and individual work orders. Most of these contracts push the risk associated with Debtor's work on the project to Debtor. These risks include delay damages, costs of completion/repair, indemnification, duty to defend, warranty obligations, rights to withhold and setoff, and damages associated with liens of Debtor's subcontractors or suppliers. Moreover, most of these contracts also require Debtor to assume any obligation that the upstream contractor owes to either the general contractor or the owner of the project. Therefore, any damages that can be assessed against the general contractor or the upstream contractor by the owner or the general contractor for Debtor's work can be assessed against Debtor under the contracts.

Generally, these risks become increasingly costly if Debtor is in default under these contracts or is terminated from the projects. If termination occurs, most of the contracts allow the contracting party to withhold funds from Debtor until the total cost of completion/repair is determined, meaning any damage that can be claimed under the applicable contracts. These costs can take the form of replacement contractors, use of equipment, use of materials, liquidated damages for delay, attorney's fees, and other costs. If the total cost of completion is more than the contract balance, then the Debtor is liable to the contracting party for the excess amount, which is usually the case. Furthermore, many of the contracts still give the contracting party the right to setoff for any debt created under that project or any other project or contract with the same entity. Thus, even if the cost of completion is less than the contract, the contracting party still may have the ability to set off those funds on a different project.

Moreover, issues will continue to arise after termination as most indemnification, duty to defend, and warranty obligations survive the termination of the contract in most instances. Finally, most of these contracts do not include any limitation of liability, and any

waiver of consequential damages usually carves out other damages already provided for in the contract, such as liquidated damages.

The foregoing illustrates how costly defaulting under these contracts can be for the Debtor. Therefore, in a Chapter 7 Liquidation where the Debtor stops work on all its jobs, the Debtor's upstream concrete contractors and general contractors hold the contractual rights to seek significant damages due to Debtor's then breach of contract, failure to perform, back charges, and remobilization or replacement pumper charges. These amounts could be used to setoff or recoup against Debtor's receivables and could be in the millions of dollars. Thus, a Chapter 7 Liquidation would severely reduce the collection of receivables for work already performed and invoiced while the Debtor's concrete contractors and general contractors seek to offset or recoup against their contractual rights and remedies. Moreover, a Chapter 7 Liquidation would also increase the amount of Debtor's creditors and not just the upstream contracting party. It is important to note that in certain jurisdictions, payments for construction projects are viewed as trust funds for downstream subcontractors and suppliers. Therefore, those parties would also have claims to those funds that are being paid.

The industry does not have many large, commercial focused concrete pumping service companies, with only 5% of the 580 ACPA membership with truck-mounted boom pumps listing fleets of more than 20 machines and only another 11% listing fleets between 10 and 20 units, leaving 84% with 1-9 machines (and 63% of the 580 members with fewer than 6 machines). Therefore, only about 30 companies are potentially capable of absorbing the Debtor's work. Thus, in a Chapter 7 Liquidation scenario, the dearth of replacement concrete pumpers will increase the amount of project delay damages and pass-through charges the Debtor's concrete contractors and general contractors will use to setoff against their receivable due the Debtor.

Further, the price of work to be fulfilled by a new concrete pumper will be substantially higher due to increased costs since the Debtor engaged in its contracts, and this too will result in excess damage charges from the Debtor's customers and, mostly likely, a refusal by Debtor's customers to pay on the receivables for work already performed.

Finally, in a Chapter 7 Liquidation scenario, even if the anticipated holdbacks, setoffs, and recoupments by the Debtor's concrete contractors and general contractors are subject to legal pursuit by the Chapter 7 Trustee, the Trustee still would incur substantial attorney and accountant fees pursuing these receivables from general contractors in multiple states and counties.

Extensive analysis on each project was performed by identifying ten attributes of each project and its difficulty or risk of damage rating for which a discount or damage to AR and breach of contract claims would likely produce. This risk assessment of claims arising only in a Chapter 7 liquidation scenario was valued and included in the liquidation analysis as unsecured claims to receive similar treatment to other unsecured creditors that would exist in either a Chapter 11 or Chapter 7 scenario.

All of these issues coalesce in a very real and substantial deterioration of the value of the Debtor's receivables and help explain why the Debtor's Reorganization Plan in Chapter 11 is the best solution for not just the Debtor but all its creditors and customers.

EXH. B

**EXHIBIT B**
## Liquidation Analysis

### Western Concrete Pumping - Ch. 7 Liquidation Analysis

| | | Est. on May 1, 2024 Book Value | As of May 1, 2024 Ch. 7 Liq. Value | % Recovery | | BKY Distrib | Liquidated Balance |
|---|---|---|---|---|---|---|---|
| Cash | unswept bal | $ - | $ - | | | | |
| AR | FLV, Damage | $ 11,905,934 | $ 5,977,168 | 50% | | | |
| Parts Inventory | FLV | $ 3,864,000 | $ 572,076 | 15% | | | |
| Fixed Assets | FLV | $ 1,654,602 | $ 579,111 | 35% | | | |
| Prepaids | n/a | $ 115,000 | $ 115,000 | 100% | | | |
| Insurance Proceeds | n/a | $ 16,000,000 | $ 16,000,000 | 100% | | | |
| Total Assets | | $ 33,539,536 | $ 23,243,354 | | | | |
| **Net recovery available to Creditors** | | | | | | | $ 23,243,354 |
| <u>SECURED CREDITORS</u> | | | | | | | |
| Tax Claims | Class 1 | $ 20,913 | $ 20,913 | 100% | $ (20,913) | | $ 23,222,441 |
| First United Bank ABL | Class 2 | $ 2,378,685 | $ 1,344,636 | 100% | $ (1,344,636) | | $ 21,877,805 |
| AFCO Insurance Claim | Class 3 | $ 221,843 | $ 221,843 | 100% | $ (221,843) | | $ 21,655,962 |
| Ally Financial | Class 4A | $ 384,942 | $ 384,942 | 100% | $ (384,942) | | $ 21,271,020 |
| Leaf Capital Funding LLLC | Class 4B | $ 86,895 | $ 86,895 | 100% | $ (86,895) | | $ 21,184,125 |
| Pawnee Leasing Corp. | Class 4C | $ 4,721 | $ 4,721 | 100% | $ (4,721) | | $ 21,179,404 |
| Stellantis Financial Services Inc. | Class 4D | $ 132,643 | $ 132,643 | 100% | $ (132,643) | | $ 21,046,760 |
| Ch.7 Trustee fees & expenses | Admin Expenses | $ - | $ 1,222,051 | 100% | $ (1,222,051) | | $ 19,824,710 |
| Ch.11 Sub. V Trustee fees | Admin Expenses | $ - | $ 20,000 | 100% | $ (20,000) | | $ 19,804,710 |
| Ch.11 Legal fees & expenses | Admin Expenses | $ - | $ 200,000 | 100% | $ (200,000) | | $ 19,604,710 |
| Ch.11 Financial Advisor fees & expenses | Admin Expenses | $ - | $ 190,000 | 100% | $ (190,000) | | $ 19,414,710 |
| Other Admin Claims | Admin Expenses | $ - | $ 1,300,000 | 100% | $ (1,300,000) | | $ 18,114,710 |
| **Net available for Unsecured Creditors & Others** | | | $ 18,114,710 | | | | |
| <u>UNSECURED CREDITORS</u> | | | | % Pro Rata | | | |
| Other Priority Claims | Class 5 | $ - | $ - | 0.0% | | $ - | $ 18,114,710 |
| General Unsecured Claims | Class 6A | $ 2,126,740 | $ 2,126,740 | 2.3% | 19.4% | $ (413,228) | $ 17,701,482 |
| Tort Judgement Creditors | Class 6B | $ - | $ 58,750,000 | 63.0% | 19.4% | $ (11,415,185) | $ 6,286,297 |
| Other Insurance Claims | Class 6C | $ - | $ 495,000 | 0.5% | 19.4% | $ (96,179) | $ 6,190,118 |
| <u>REJECTION CREDITORS</u> | | | | | | | |
| Rejection Creditor: Equip Lease | Rejection Claim | $ - | $ 21,125,067 | 22.7% | 19.4% | $ (4,104,622) | $ 2,085,496 |
| Rejection Creditor: Customer | Rejection Claim | $ - | $ 8,468,940 | 9.1% | 19.4% | $ (1,645,524) | $ 439,972 |
| Rejection Creditor: Landlord | Rejection Claim | $ 2,264,384 | $ 2,264,384 | 2.4% | 19.4% | $ (439,972) | $ (0) |
| <u>EQUITY</u> | | | | | | | |
| Interests in the Debtor | Class 7 | $ - | $ - | 0.0% | | $ - | $ (0) |
| **Total Unsecured Creditors** | | $ 4,391,124 | $ 93,230,131 | 100.0% | | $ - | |
| **Net Excess/(Shortfall)** | | | $ (75,115,422) | | | | |

EXH B.